1                 IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4   UNITED STATES OF AMERICA        §      CASE NO. 4:20-CR-00671
                                    §      HOUSTON, TEXAS
5   VERSUS                          §      MONDAY,
                                    §      DECEMBER 28, 2020
6   CORTEAUS ROGERS                 §      9:58 A.M. TO 11:38 A.M.

7
                     DETENTION HEARING (VIA ZOOM)
8
            BEFORE THE HONORABLE CHRISTINA A. BRYAN
9                 UNITED STATES MAGISTRATE JUDGE

10

11      APPEARANCES:                      SEE NEXT PAGE
        CASE MANAGER:                     CYNTHIA JANTOWSKI
12      ERO:                              SHADIA NASH

13

14  **THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED
15  BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND
16  ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United
    States Court, Southern District of Texas.**

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                     935 Eldridge Road, #144
22                   Sugar Land, TX 77478
                        281-277-5325
23                www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1                        APPEARANCES (VIA ZOOM):

2

3   FOR THE PLAINTIFF:            U. S. ATTORNEY'S OFFICE
                                  Carrie Wirsing, Esq.
4                                 1000 Louisiana St., Suite 2300
                                  Houston, TX  77002-9781
5

6
    FOR THE DEFENDANT:            HILDER ASSOCIATES PC
7                                 James Gregory Rytting, Esq.
                                  819 Lovett Boulevard
8                                 Houston, TX  77006-3905

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3    WITNESS:            Direct      Cross      Redirect      Recross

4    SEEMANTH RAJ
     By Ms. Wirsing      11                        31
5    By Mr. Rytting                  25                          32

6    CATRENA MILLENDER
     By Mr. Rytting      35
7    By Ms. Wirsing                  46

8

     EXHIBITS:                       Received
9
     Pretrial Report                 24
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      HOUSTON, TEXAS; MONDAY, DECEMBER 28, 2020; 9:58 A.M.

2           THE COURT:  Good morning, everyone.  Do we have

3    everyone that we're waiting for?

4           MS. WIRSING:  Yes, Your Honor.  Good morning.

5           THE COURT:  Good morning.

6           THE CLERK:  Yes, Judge.  I believe we have

7    Ms. Wirsing for the Government.  We have our ERO, Shadia

8    Nash, and I couldn't see Mr. Redding [sic] and his witness.

9           THE COURT:  (Indiscernible).

10          THE CLERK:  Can you see them on the --

11          THE COURT:  I see --

12          MS. SPEAKER:  James --

13          THE COURT:  Is it Rytting or Redding?

14          MR. RYTTING:  Can you hear me?

15          THE COURT:  Yes.

16          MR. RYTTING:  But I'm not getting on camera.

17          THE COURT:  No, I can see you.  Ms. Jantowski

18   doesn't have video.  She's just on audio.

19          MR. RYTTING:  Okay, thank you, Judge.  Yes, --

20          THE COURT:  I can see (indiscernible)

21          MR. RYTTING:  -- we have (indiscernible) witness

22   that was supposed to call in.  This is her right now on the

23   cellphone.  Let me take a brief -- may I please take that?

24   She may need some direction.

25          THE COURT:  Yes.

1          MR. RYTTING:  Yes.

2          THE COURT:  And, Mr. Raj, are you representing

3   someone here today?

4          MR. RYTTING:  Click on the link.

5          MS. WIRSING:  Your Honor, that is the case agent

6   for the --

7          THE COURT:  Okay.

8          MS. WIRSING:  -- detention hearing.

9          THE COURT:  All right, thank you.

10          MR. RYTTING:  And if you need a passcode, I'll

11   have to send it to your email.  It's a long code.  Yes.  All

12   right, Trina (phonetic), I'll have to email that to you.

13   Hello?  Just a little problem.  She apparently cannot click

14   on the link (indiscernible) and I don't have an email for

15   her right now so it'd be difficult for me to try

16   (indiscernible) passcode to someone in a message.  I'm

17   trying to -- I'll try again to see if I can't reach her.

18          I could say this.  I wasn't able to have a

19   pretrial conference with my client.  I don't -- exactly what

20   happened with Joe Corley but they did not have him available

21   15 minutes ahead of time.  So I haven't been able to go

22   through things like the waiver of the appearance, live

23   appearance, in court.  You may wish to do that, Judge,

24   (indiscernible) --

25          THE COURT:  Well, --

1            MS. WIRSING:  Your Honor, --

2            THE COURT:  Yes, Ms. Wirsing.

3            MS. WIRSING:  -- I have to be back here at 2:00

4    o'clock.  I don't know about the agent.  But if that would

5    provide attorney Rytting some time with his client.

6            THE COURT:  Instead of coming back at 2:00

7    o'clock, what I'm going to do is give him a few minutes now

8    because we have other detention hearings set for 2:00

9    o'clock today.  So, Mr. Rytting, you have to cover the

10   waiver of personal appearance because I cannot accept a

11   waiver from him unless it's an informed waiver after

12   consulting with counsel.

13           MS. WIRSING:  Yes, Your Honor.

14           THE COURT:  So what we're going to do is the Court

15   is going to mute their computer --

16           THE CLERK:  (Indiscernible).

17           THE COURT:  Mute yours and I will ask counsel and

18   the case agent to step away from the screen for a few

19   minutes.  We'll resume here at 10:15.

20           MS. WIRSING:  Very well.  Thank you, Your Honor.

21           THE COURT:  All right.  And if you need --

22           MR. RYTTING:  Thank you.

23           THE COURT:  If you need more than that,

24   Mr. Rytting, email Ms. Jantowski.

25           MR. RYTTING:  I shall.  Thank you, Judge.

1           THE COURT:  Thank you.

2        (Recess taken from 10:02 a.m. to 10:15 a.m.)

3                        AFTER RECESS

4           THE COURT:  Mr. Rytting, are you ready?

5           MR. RYTTING:  (No audible response).

6           THE COURT:  All right, we'll give you a couple

7   more minutes.

8        (Pause from 10:15 a.m. to 10:16 a.m.)

9           MR. RYTTING:  Okay.  I'll just have him call the

10  judge.  But stay on the line.  Judge?

11          THE COURT:  Yes.

12          MR. RYTTING:  I am -- I have spoken with

13  Mr. Rogers, although he's on mute right now.

14          I informed him of what the situation is with the

15  waiver and he is willing to waive his appearance.  If you

16  want to get him off mute, he'll say so.  I have -- I gave

17  the witness the link and I gave her the meeting and ID.

18  Everything went fine through the input of the meeting ID but

19  then the password did not allow her to join this conference,

20  so we're without a witness in this situation.

21          MS. WIRSING:  I'd be happy with a proffer.

22          THE COURT:  All right.

23          MR. RYTTING:  I believe I can -- if that's fine

24  and there's no objection --

25          THE COURT:  Can she phone in even if she's not on

1  the video?  Can she telephone in?  There's different --

2         MR. RYTTING:  Yeah, she can telephone in to

3  whatever number you give her, Judge.

4         THE COURT:  Ms. Jantowski, did you -- did the

5  email that you sent to counsel have the instructions for

6  phoning in?

7         THE CLERK:  Yes, Judge.  I can resend it to

8  counsel and I'll highlight the phone-in instructions as

9  well.  Okay?

10         THE COURT:  Yes, that'd be good.  All right.  So,

11  counsel, have your witness telephone in.  We'll go ahead and

12  start the hearing.  We can take a proffer from a -- who is

13  the witness?

14         MR. RYTTING:  Her name's Catrena Millender.

15  That's M-I-L-L-E-N-D-E-R.

16         THE COURT:  And what's her relationship to

17  Defendant?

18         MR. RYTTING:  Fiancé.

19         THE COURT:  His fiancé, all right.  All right.

20  I'm going to go ahead and call the case.  She can phone in

21  and participate by telephone and then you can make a proffer

22  at the appropriate time.  All right.  This is case number

23  4:20-cr-671-1, *United States of America versus Corteaus*

24  *Rogers*.  We are present for a detention hearing

25  (indiscernible) and, counsel, may I have you announce your

1  appearances for the record, please?

2          MS. WIRSING:  Good morning, Your Honor, Carrie

3  Wirsing representing the United States.

4          MR. RYTTING:  James Rytting representing

5  Mr. Corteaus Rogers.

6          THE COURT:  All right.  Thank you, Mr. Rytting.

7  Has Mr. Rogers been arraigned yet?

8          MR. RYTTING:  Yes, he has.

9          THE COURT:  All right.  And, Ms. Wirsing, was the

10 Rule 5 disclosure order given at the arraignment/appearance?

11         MS. WIRSING:  Yes, Your Honor.  Judge Bray is very

12 diligent about that.

13         THE COURT:  All right, thank you.  All right,

14 Ms. Wirsing, what's the basis for your motion to detain?

15         MS. WIRSING:  Your Honor, we are concerned about

16 the safety of the community as well as the risk of flight

17 given the lack of ties to the Houston community and the

18 extensive criminal record of the Defendant, as well as the

19 circumstances of this arrest.  For that reason, we are

20 seeking detention.  We are in receipt of the Pretrial

21 Services Report which also recommends detention without

22 bond.  We have a witness available today and we are ready to

23 proceed to a hearing.

24         THE COURT:  All right.  Thank you, Ms. Wirsing.

25 Okay, all right, Mr. Corteaus, are you able to see me on the

1    video in front of you?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  All right.  Sir, we're here today for

4    a detention hearing.  The Government has made a move to keep

5    you in custody until the time of your trial.  As you were

6    informed at your initial appearance, you have the right to a

7    hearing on the issue of detention.  Your counsel has had the

8    opportunity -- took a recess for your counsel to have the

9    opportunity to speak with you here this morning regarding

10   this detention hearing and your rights to appear for this

11   hearing in person.  You have the right to have this hearing

12   take place in the courtroom and to be able to see the

13   witnesses and hear the testimony in person before me in the

14   courtroom; do you understand that right?

15             THE DEFENDANT:  Yes, ma'am.

16             THE COURT:  And after talking with your attorney,

17   are you agreeing to give up the right to have this in person

18   in court and proceed by video conference due to the

19   coronavirus pandemic?

20             THE DEFENDANT:  Yes, ma'am.  I'll waiver that, I

21   waiver my right.

22             THE COURT:  All right, thank you, sir.  I'm going

23   to note on the record that you're waiving your right to

24   personal appearance and you're consenting to appear by video

25   pursuant to the CARES Act.

1          All right, with that, Ms. Wirsing, go ahead and

2    call your first witness.

3          MS. WIRSING:  Thank you, Your Honor.  The

4    Government calls Agent Raj.

5          THE COURT:  Mr. Raj, I'm going to have -- or,

6    Agent Raj, I'm going to have Ms. Jantowski swear you in.

7          MR. RAJ:  Yes, Your Honor.

8          THE CLERK:  Can you please raise your right hand?

9          SEEMANTH RAJ, GOVERNMENT'S WITNESS, SWORN

10         THE CLERK:  Thank you.

11         THE WITNESS:  Thank you.

12         THE COURT:  All right.  Are you all able to hear

13   with my typing?  Is it interfering with anyone's ability to

14   hear?

15         MS. WIRSING:  I did not notice, Your Honor.

16         THE COURT:  All right.  You may proceed,

17   Ms. Wirsing.

18         MS. WIRSING:  Thank you, Your Honor.

19              DIRECT EXAMINATION OF SEEMANTH RAJ

20   BY MS. WIRSING:

21   Q    Please state your name for the Record.

22   A    Seemanth Raj.

23   Q    How are you employed?

24   A    I am a special agent with the Bureau of Alcohol,

25   Tobacco, Firearms, and Explosives, the ATF.

1  Q    What are your duties there?

2         THE COURT:  May I have you speak loudly, Mr. Raj?

3  Just -- I'm going to try to use headphones but I'm having a

4  little bit of a hard time hearing you.

5         THE WITNESS:  Sure, yes, ma'am.

6         I am in a group at the ATF that focuses

7  specifically on violent offenders -- I'm sorry, specifically

8  on aggravated robbers, commercial robberies.  But we focus

9  specifically on violent offenders and targeting them when

10 they -- especially when they use firearms to commit

11 aggravated robberies and violent offenses.

12        MS. WIRSING:  Your Honor, are you able to hear the

13 witness at this time?

14        THE COURT:  Yes, thank you, Ms. Wirsing.

15 BY MS. WIRSING:

16 Q    Were you involved in an investigation into individual

17 by the name of Corteaus Rogers?

18 A    Yes, ma'am.

19 Q    And he was stopped on April 27th during your -- a

20 traffic stop; is that correct?

21 A    That is correct.

22 Q    And that's April 27th of this year, 2020; is that

23 right?

24 A    That is correct.

25 Q    Can you please tell the judge the circumstances of the

1  traffic stop?

2  A    Sure.  I --

3  Q    And you were not personally -- I'm sorry.  You were not

4  personally involved in the traffic stop; is that correct?

5  A    Actually I was there.  I was there, --

6  Q    Oh.

7  A    -- yes, ma'am.  So I worked with a HPD tactical unit on

8  the north side near Greenspoint and they were investigating

9  a series of robberies involving basically purse snatchings

10  in mall parking lots where the suspect would drive by in a

11  car and just basically grab somebody's purse as they're

12  walking in the parking lot, or they would get out of the car

13  and target mostly women with their purses, and they would

14  target them and take their purses using force.  So we were

15  working and trying to track the suspect.

16      So we were able to get onto a vehicle that was used.  A

17  vehicle actually was put out on the -- in the media.  This

18  media was shown that this is the Nissan with some extensive

19  front-end damage.  So Enterprise, where this car was rented

20  from, actually recognized that vehicle and said, hey, you

21  know, this is the vehicle that was rented out.  It was

22  actually reported stolen because the vehicle was not

23  returned on time.  So that's kind of how our investigation

24  jumped off.

25      We went and looked, you know, saw the vehicle.  And

1  Mr. Rogers had actually left his court documents in the

2  vehicle so that's how we were able to get onto Mr. Rogers

3  and identify Mr. Rogers as a possible suspect.  So one of

4  the HPD officers was actually conducting some surveillance

5  in the Willowbrook area in the mall area because that's

6  where all the robberies are gone down, just to kind of be

7  there and be on the lookout, and actually spotted

8  Mr. Rogers, who he knew by name and sight (indiscernible)

9  Mr. Rogers in a car with (indiscernible) at that time

10  unidentified female.

11      So we were able to surveil him.  Basically the officer

12  was able to actually see Mr. Rogers and this female going to

13  multiple mall parking lot shopping centers and they

14  basically were what we call "sharking," kind of looking for

15  targets.  We were able to follow and then --

16  Q    So let me just stop you there.  So the series of

17  robberies, was that -- were those allegedly committed by one

18  person or more than one person, according to reports?

19  A    So there were -- there was supposed to be multiple

20  people in the vehicle.  But most of the witness -- or the

21  complaints were not able to -- they didn't recognize the

22  person so they were able to tell us in the reports that

23  there were multiple people in the vehicle and usually --

24  they didn't tell us at least in the reports whether they

25  were female or male, the other person in the vehicles.  But

1  they did say there was multiple --

2  Q    Okay.  That's (indiscernible) all right.  So you

3  continue to surveil the video -- or, I'm sorry, the vehicle.

4  And what happened?

5  A    Yes, ma'am.  So we were -- we finally (indiscernible)

6  traffic stop based on PC, conduct a traffic stop, and

7  (indiscernible) --

8  Q    So there was a traffic violation.

9  A    Yes, ma'am, yes, ma'am.  The traffic violation that

10 ended up being stopped was for going across multiple lanes

11 without turn signal, basically driving dangerously.  So we

12 were able to conduct a traffic stop.  And in the vehicle we

13 found multiple purses and just we -- what we recognized as

14 possible fruits from the -- or things taken during the

15 robbery.  So we were able to identify those.  And during the

16 interview -- and also we located a pistol that was on the

17 passenger side between the center console right on the

18 floorboard, so between the seat and the -- on the center

19 console.

20 Q    Okay.  Who was --

21 A    So during the --

22 Q    -- driving the vehicle?

23 A    Mr. Rogers.

24 Q    And was --

25 A    And --

1   Q    -- any (indiscernible) present?

2   A    Yes, ma'am.  So in the passenger seat was Ms. Braggs,

3   Deja Braggs (phonetic).  She claimed to be his,

4   Mr. Rogers's, girlfriend.  And during the interview --

5   Q    Did (indiscernible) statement?

6   A    So we mirandized both of them and we took them back to

7   the station where they agreed to speak with us.  Ms. Braggs

8   stated that once the HPD officer got behind for the traffic

9   stop, Mr. Rogers told her and he grabbed the gun that was

10  sitting behind them in the -- behind the passenger seat

11  where Mr. Rogers could easily grab it, told her, hey, grab

12  the gun, put it by you.  And she did say that was

13  Mr. Rogers's gun.  We also then talked to Mr. Rogers, we

14  mirandized him, we interviewed him.  He completely denied

15  having anything to do with robberies.  He said he was -- he

16  basically sold purses, knockoff purses, that he would buy

17  off the street, then he'd sell them.  He said he didn't take

18  part in any of the robberies.  But he did take ownership of

19  the gun, he said it's my gun, I keep my -- I --

20          MS. WIRSING:  Oh, I'm sorry.  Hello?

21          THE COURT:  We've lost --

22          MS. WIRSING:  I'm sorry, --

23          THE COURT:  -- Agent Raj for a moment.

24          MS. WIRSING:  I froze as well.

25          THE COURT:  See if we can get him back.  Might

 1  just want to email him, Ms. Wirsing, and let him know

 2  that --

 3           MS. WIRSING:  I will text him right now.

 4           THE COURT:  Okay.

 5       (Pause from 10:30 a.m. to 10:31 a.m.)

 6           MS. WIRSING:  Okay.  He indicated that he's aware

 7  and he's attempting to log back in right now.  He indicated

 8  that it's being difficult but he's continuing to try.  He's

 9  going to sign out and sign back in.

10       (Pause from 10:32 a.m. to 10:33 a.m.)

11           THE COURT:  I don't see him entering the

12  conference.

13       (Pause from 10:33 a.m. to 10:34 a.m.)

14           MS. WIRSING:  Okay, Your Honor, he did something

15  to use the Zoom link on his iPhone, which is what I had to

16  do because my computer also stopped working.  So if we could

17  just wait a moment to see if that works?

18           THE COURT:  All right.

19           MR. SPEAKER:  (Indiscernible).

20           MR. RYTTING:  Your Honor.

21           THE COURT:  Yes.

22           MR. RYTTING:  Ms. Catrena Millender has managed to

23  call in and she's on the line.

24           THE COURT:  Okay, thank you.  She the 832 -- well,

25  phone number ending in 6278; is that correct?

1           MR. RYTTING:  That is correct.

2           THE COURT:  All right, thank you.

3           THE DEFENDANT:  (Indiscernible).

4           THE COURT:  (Indiscernible) well, we're on the --

5           THE DEFENDANT:  (Indiscernible).

6           THE COURT:  -- record so anything you say is going

7    to be recorded.  Do you want to speak with your attorney in

8    private?

9           THE DEFENDANT:  Yes, sir, I want to speak with him

10   in private, yes, ma'am.

11          THE COURT:  All right.  Let's take this

12   opportunity while we're waiting for Agent Raj to reconnect,

13   I'm going to mute -- Mr. Rytting, can you call the Defendant

14   again at Joe Corley?

15          MR. RYTTING:  Yes, I can, Your Honor.

16          THE COURT:  All right.  I'm going to mute the

17   Defendant and you, Mr. Rytting.

18          MR. RYTTING:  Thank you.

19          THE COURT:  Wave at me when you want to be

20   unmuted.

21          MR. RYTTING:  I will, Your Honor.

22      (Defendant/counsel confer from 10:35 a.m. to

23   10:39 a.m.)

24          THE COURT:  I don't -- Mr. Rytting, we still don't

25   have our case agent, but are you finished with your

1   conference with the Defendant?

2         MR. RYTTING:  Yes, Your Honor, I am.

3         THE COURT:  All right.  I'm going to unmute the

4   Defendant, there we go.  Ms. Wirsing, can I get an update on

5   Agent Raj's ability to connect via Zoom?

6         MS. WIRSING:  Okay, Your Honor, he is having

7   difficulty.  He's tried to download the app on his iPhone,

8   and I sent him the link hoping he could just click on that

9   through his phone and he said it wasn't working.  So we're

10  on pause.

11        THE COURT:  All right.

12        MS. WIRSING:  Can he call in by telephone?  Is

13  there any objection to that?  I know it's not preferred.

14        THE COURT:  Mr. Rytting, do you object to the

15  witness testifying by telephone, not appearing on the video

16  screen?

17        MS. WIRSING:  I only have a couple more questions

18  for him and then, you know, cross-examination.

19        MR. RYTTING:  I do not object the -- a telephone

20  appearance by Mr. Raj.

21        THE COURT:  All right.

22        MS. WIRSING:  I'll have him call in.  Is there a

23  good number that he should call, is it -- it's on the Zoom

24  instructions.

25        THE COURT:  That is on the Zoom instructions.

SEEMANTH RAJ - DIRECT BY MS. WIRSING                     20

 1        (Pause)

 2             MS. WIRSING:  Okay.  I'm just getting the Zoom

 3    instructions.  Could I just get some assistance with the

 4    number?

 5             THE COURT:  Ms. Jantowski, can you read -- do you

 6    have the number available to read to Ms. Wirsing?

 7             THE CLERK:  Yes, I do.  And I just sent an email

 8    to Ms. Wirsing as well.  The dial-in number is 669-254-5252.

 9             MS. WIRSING:  And then --

10             THE CLERK:  Meeting ID number is --

11             MS. WIRSING:  Yes.

12             THE CLERK:  -- 1604808236.  And the passcode is

13    194637.

14             MS. WIRSING:  Let's see.  Okay.  I've sent that

15    information to the agent.  Thank you for the highlights.

16    That helped.

17             THE CLERK:  You're welcome.

18        (Pause)

19             MS. WIRSING:  All right.  He said he's getting

20    onto the phone now, that he's actually now signed into Zoom

21    and that he'll enter the ID and join.

22             THE COURT:  Okay.

23        (Pause)

24             MS. WIRSING:  It appears he's joining.

25             THE COURT:  All right.  In the meantime, can I get

1    the defense witness's name again, please?

2            MR. RYTTING:  Catrena, that's spelled

3    C-A-T-R-E-N-A, Millender.  And I'm fairly sure that's

4    spelled M-I-L-L-E-N-D-E-R.

5            THE COURT:  All right, Mr. Raj, you need to

6    unmute.  There you go.  Agent Raj, can you hear us?

7            THE WITNESS:  Yes, ma'am.  I apologize.

8            THE COURT:  Okay.  We just need to make sure that

9    everyone, when they are appearing on Zoom, has everything

10   prepared in advance, including an app downloaded onto their

11   phone so that if their computer doesn't work, they can

12   access by phone if at all possible.

13           THE WITNESS:  Yes, Judge.

14           THE COURT:  All right.  So last thing that I heard

15   you say was that Mr. Rogers admitted the gun found in the

16   car was -- belonged to him.

17           THE WITNESS:  Yes, that's correct, Judge.  He did

18   say the gun belonged to him.  He stated that he purchased

19   the gun off the street and he kept it for protection because

20   there were a few people in Houston that were looking to kill

21   him.  So he -- that's the reason he had the gun.

22                DIRECT EXAMINATION (Continued)

23   BY MS. WIRSING:

24   Q    Agent Raj, what kind of gun was it that was found?

25   A    It was a Taurus nine millimeter, I believe.

1  Q     Did you conduct a search of Mr. Rogers's criminal

2  history?

3  A     Yes, ma'am, I did.

4  Q     And were you able to determine whether or not he was a

5  person not to possess this firearm lawfully?

6  A     That is correct, yes, ma'am.  In addition to the

7  history he has in Houston, he has an extensive criminal --

8  Louisiana in the Baton Rouge area.

9         MS. WIRSING:  And, Your Honor, at this time I

10  would ask the Court to take judicial notice of the criminal

11  history that is provided in the Pretrial Services Report.

12         MR. RYTTING:  I would object to judicial notice of

13  the Pretrial Report.  I believe it's hearsay.  And a lot of

14  the cases, as you see from the Pretrial Report, the

15  disposition is unknown.  So I don't believe it's a reliable

16  enough document to -- for the Court to take judicial notice

17  of.

18         MS. WIRSING:  Your Honor, hearsay is allowed at

19  this stage.  The Pretrial Services Report is a part of the

20  record for the purposes of this hearing.  So I can ask the

21  agent to -- I can send him a copy and ask him to testify to

22  everything that's in the report.

23         THE COURT:  So, Mr. Rytting, the Rules of Evidence

24  don't apply to this hearing.  And I don't think that

25  Ms. Wirsing is doing anything or requesting anything other

1  than to, "A," note the information in the Pretrial Report as

2  it is contained in the Pretrial Report and, therefore, when

3  we have an unknown disposition, I don't think she's

4  attempting to do anything other than note the fact of the

5  information.  And it's standard procedure for the Court to

6  rely on the information contained in the Pretrial Services

7  Report.  You are welcome to question the witness about any

8  of the criminal history and/or ask questions of the Pretrial

9  Services officer who is here on the telephone with us, on

10 the video conference with us.  And therefore I'm overruling

11 your objection.

12         MR. RYTTING:  Thank you, Your Honor.  If I may

13 just say, the objection really is not so much to hearsay but

14 to the judicial notice, which is a technical term that

15 indicates that facts have been established beyond any

16 reasonable dispute.  And that's why my objection.

17         THE COURT:  Well, I guess a better way to say it

18 is we're admitting the Pretrial Services Report into

19 evidence at this detention hearing, it is part of the

20 record, and the Court will be relying on it.  How's that?

21      (An unnumbered exhibit, the Pretrial Report, was

22 received in evidence.)

23         MR. RYTTING:  Thank you, Your Honor.

24         MS. WIRSING:  All right.  May I proceed, Your

25 Honor?

1          THE COURT:  You may.

2          MS. WIRSING:  Thank you.

3    BY MS. WIRSING:

4    Q    Agent Raj, did you hear the name of the defense witness

5    when it was stated earlier?

6    A    No, ma'am.  Can you repeat that name?

7    Q    I believe it's Carena or Catrena Millender; does that

8    sound familiar?

9    A    (No audible response)

10   Q    If not, that's fine.

11   A    Not right now, ma'am.  I don't -- that (indiscernible).

12   Q    And do you have any other knowledge of Mr. Rogers and

13   his connections in Houston or his activities in Houston, any

14   employment, residence, anything like that?

15   A    Not to my knowledge, ma'am.  I don't know of any

16   employment.  I do know he has -- other than Ms. Braggs there

17   is a female.  I'm not sure if it's his ex-wife or his ex-

18   girlfriend, but they have been -- they were not together at

19   this time when the arrest was made.  I believe there was

20   some other criminal cases pending regarding that ex-wife.

21   I'm not sure about her name now but regarding that ex-wife,

22   between her and (indiscernible) --

23          MS. WIRSING:  Okay.  I'll be sure to enquire about

24   that later.  Agent Raj, I don't have any further questions

25   at this time, and I'll pass the witness.

SEEMANTH RAJ - CROSS BY MR. RYTTING                    25

1          THE COURT:  You may go ahead, Mr. Rytting.

2          MR. RYTTING:  Mr. Raj, I'm James Rytting, counsel

3   for Defendant, Corteaus Rogers.

4              CROSS-EXAMINATION OF SEEMANTH RAJ

5   BY MR. RYTTING:

6   Q    You said you were involved in the arrest of Mr. Rogers,

7   correct?

8   A    That's correct.  I was (indiscernible) during this

9   traffic stop, yes, sir.

10  Q    And when did you -- and you were in an unmarked car,

11  correct?

12  A    That's correct.

13  Q    So you started following Mr. Rogers at one point or the

14  car that he was in.

15  A    I did not personally follow, sir.  It was the HPD

16  officers and the tactical unit.

17  Q    And were those HPD officers in an unmarked car?

18  A    There were some unmarked and some marked units, yes,

19  sir.

20  Q    But the one that was following Mr. Rogers in an

21  unmarked car.

22  A    Yes, sir.  There were multiple units in unmarked

23  vehicles following Mr. Rogers, yes.

24  Q    And they tailed him from the parking lot onto the

25  highway, correct?

1   A     That's correct, yes, sir.

2   Q     And one of the cars was a black Charger; is that

3   correct?

4   A     That's correct, yes, sir.

5   Q     And that was the car that was behind Mr. Rogers, right?

6   A     It was behind him for a moment, yes, sir.

7   Q     Okay.  And that -- did that car follow him onto the

8   highway?

9   A     I can't speak to that, sir.  I'm not sure where that

10  car was when they were being -- when he was being followed.

11  Q     And so there were multiple cars that were following

12  him.

13  A     That's correct, yes, sir.

14  Q     And you say that some of them weren't with which -- was

15  there anyone that was unmarked?

16  A     I believe there were two units -- I'm sorry, there were

17  two marked units which were used to make the traffic stop.

18  I can't speak to how many unmarked.  I want to say if I were

19  to guess maybe about three, four unmarked units.

20  Q     And they -- and all these units were following

21  Mr. Rogers.

22  A     That's correct, yes, sir.

23  Q     And they followed him onto the highway.

24  A     I believe so, yes, sir.

25  Q     And at some time Mr. Rogers or a person in the vehicle

1  noticed that they were being followed; isn't that correct?

2  A    Mr. Rogers stated that he did notice the black Charger

3  that was following him in the interview, yes, sir.

4  Q    And you would -- and it wouldn't be surprising if you

5  have four -- three or four cars following you that would

6  think that there is something --

7           MS. WIRSING:  Objection; calls for speculation.  I

8  guess the rules don't apply but, okay, I -- objection,

9  relevance.

10          THE COURT:  I mean, let's be quick.  I get the

11 gist of your line of questioning.  He believed that there

12 were cars following him.

13          MR. RYTTING:  That's correct, Your Honor.  And

14 that is why --

15 BY MR. RYTTING:

16 Q    And isn't it correct, Mr. Raj, that is why he made --

17 he swerved across the lane of traffic?

18          MS. WIRSING:  Objection, this agent does not know

19 what Mr. Rogers was thinking --

20          THE COURT:  Sustained.

21          MS. WIRSING:  -- other than what Mr. Rogers told

22 him.

23          THE COURT:  Sustained.  Keep it limited to issues

24 that are relevant to the detention hearing, Mr. Rytting.

25          MR. RYTTING:  Well one of the -- yes, Your Honor.

1   And one of the issues that's relevant is, you know, whether

2   the case is defensible and whether there is things like a

3   suppression issue.

4              THE COURT:  That's not something that I'm

5   considering at a detention hearing.  It's not --

6              MR. RYTTING:  Thank you, okay.  I understand, your

7   Honor, and I will proceed.

8              THE COURT:  Thank you.

9   BY MR. RYTTING:

10  Q    And how many -- you said you questioned Mr. Rogers

11  yourself at the -- about the gun.

12  A    Yes, sir.  It was me and a other HPD officer that were

13  (indiscernible) interview, yes, sir.

14  Q    And, again, you're with the Federal government,

15  correct, or are you with --

16  A    I am an ATF, yes, sir.

17  Q    But the gun was not found on Mr. Rogers, it was found

18  on the floor of the car.

19  A    Yes, sir.  It was on the passenger side between the

20  center console, floorboard between the center console and

21  the passenger -- front passenger seat.

22  Q    So closer to the passenger.

23  A    Yes, sir.

24  Q    Now, you say that you've looked at Mr. Rogers's

25  criminal record, correct?

1  A    Yes.  I have a copy of the Louisiana record that I've -

2  - I requested.  I don't have the HPD, the City, criminal

3  record in front of me.

4  Q    There's no crimes of violence against members of the

5  community at large.  It's domestic violence charges; is that

6  correct?

7  A    I believe so.  There were -- when we were looking at

8  the history of the case we were -- when we got on to

9  Mr. Rogers, we did notice that he had some prior domestic

10 violence issues, cases, pending between him and another ex-

11 girlfriend or ex-wife.  I'm not really sure about the

12 relationship right now.  But we did notice that.

13 Q    And those charges -- and those issues were at least

14 five years ago, correct?

15 A    I -- right now I'm not sure how long ago they were.

16 Q    Detective, when it comes to the purse snatching, was

17 anyone injured in those incidents?

18 A    Not to my knowledge.

19 Q    So it was -- these instances were run by, snatch this

20 purse, the purse, and escape.

21 A    Yes, sir.

22 Q    And you don't have any -- and you're not saying that a

23 witness has identified Mr. Rogers as the person that was

24 snatching the purses, do you?

25 A    Not to my knowledge, sir, there have been nobody has

1   identified him per se.

2   Q    And those guns were used to -- during the -- or

3   brandished or waved or threatened, the witnesses weren't

4   threatened by -- with bodily harm to your knowledge; is that

5   correct?

6   A    Not in these purse snatchings, no, sir.

7   Q    And so why is ATF and the Federal government and task

8   force involved in the purse snatching case?

9   A    So this is a team that I run with, that I roll with

10  basically.  It's just a team that I -- group of guys that I

11  worked with.  There are a lot of robberies, commercial

12  robberies, and crimes with aggravated assaults and stuff

13  like that that take place in Greenspoint.  So it's just a

14  team that I work with just to help them out, especially when

15  there are felons with guns committing crimes.

16  Q    And before this, Mr. Rogers was in the State system; is

17  that your understanding?  He was -- he had been arrested and

18  was charged in State cases.

19  A    Yes.  As far as my knowledge, I don't think there has

20  been a Federal case against Mr. Rogers previously.

21  Q    And did you make any agreement with the State or are

22  you aware of any --

23  A    No --

24  Q    -- about taking this case federally as opposed to

25  letting it proceed in the State system?

1   A      No, sir.  There was no agreement.

2            MS. WIRSING:  Objection, Your Honor, that's a call

3   for the -- that's within the discretion of the U. S.

4   Attorney's Office to bring charges.  That is not a matter

5   for consideration in detention.

6            THE COURT:  Sustained.

7            MR. RYTTING:  I pass the witness.

8            THE COURT:  You have any follow-up, Ms. Wirsing?

9            REDIRECT EXAMINATION OF SEEMANTH RAJ

10  BY MS. WIRSING:

11  Q      Agent Raj, was there a reason that you had so many

12  vehicles following Mr. Rogers on the highway?

13  A      Yes, ma'am.  So we have -- so it's incredibly difficult

14  to follow anybody, especially in Houston traffic it's

15  incredibly difficult.  So we have to use multiple vehicles

16  for safety reasons so that we're not, you know, violating

17  traffic and running lights trying to catch up to anybody.

18  So it's just something that we do, we have to do on a

19  tactical -- to give ourselves a tactical advantage in terms

20  of following people, because it's just really, really

21  difficult to just follow with one or even two people.  So

22  the more vehicles you can have, the more individuals you can

23  have participating, it's just safer for everybody.

24  Q      And did law enforcement have a strong interest in

25  apprehending Mr. Rogers and for the safety of the community?

1   A    Yes, ma'am, we did.  Like I said, this was a case that

2   was pretty big.  There were multiple purse snatchings,

3   multiple instances where this is happening in and around

4   (indiscernible) so this is of high interest to everybody.

5   Like I said, this came out on the news so especially for

6   the, you know, the type of individuals this person was

7   targeting, we wanted to make sure that we were -- you know,

8   we got this person off the street before he really hurt

9   somebody.

10              MS. WIRSING:  I have nothing further.

11              THE COURT:  Mr. Rytting, anything else for this

12  witness?

13              MR. RYTTING:  A couple questions, one or two.

14                RECROSS-EXAMINATION OF SEEMANTH RAJ

15  BY MR. RYTTING:

16  Q    So, Mr. Raj, is what was this -- was the arrest made?

17  A    I'm sorry, what?

18  Q    What was the date and time of the arrest?

19  A    April, let's see, it's right here, April 27th, about

20  12:30.

21  Q    Twelve-thirty in the afternoon.

22  A    Yes, sir.

23  Q    Okay.  And what day of the week was that?

24  A    I can't tell you that right now, sir.  I'm not sure.

25  Q    Okay.  And this was after the pandemic had started,

1  correct?

2  A    That's correct, yes, sir.

3  Q    And so traffic was relatively light; isn't that

4  correct?

5  A    Not up there.  It was pretty heavy up there.  I don't

6  think Houston really shut down.  And like a lot of other

7  cities, there was still quite a bit of traffic

8  (indiscernible) up there especially around the mall area,

9  around commercial businesses.

10 Q    So the -- are you saying by this time that the malls

11 had opened up and that Governor Abbott's order had been --

12          MS. WIRSING:  Objection, Your Honor.  This goes

13 way beyond --

14          THE COURT:  (Indiscernible).

15          MS. WIRSING:  -- the scope of detention.

16          THE COURT:  Mr. Rytting, --

17          MR. RYTTING:  I --

18          THE COURT:  -- you're getting into the suppression

19 issues which are not part of the hearing today so let's

20 limit the questions to issues that impact detention.

21          MR. RYTTING:  I agree.  And I'm -- I pass the

22 witness.

23          THE COURT:  All right.  You're excused, Agent Raj.

24      (Witness excused.)

25          THE WITNESS:  Yes, ma'am.  Thank you.

1          THE COURT:  Thank you.

2          Ms. Wirsing, any other witnesses?

3          MS. WIRSING:  No, Your Honor.  The Government

4   rests.

5          THE COURT:  All right.  Mr. Rytting, you may call

6   your witness or if you want to call the witness by phone,

7   Ms. Wirsing, would you object that the witness testify by

8   phone?

9          MS. WIRSING:  No objection, Your Honor.

10         THE COURT:  All right.  Mr. Rytting, you may call

11  the witness by phone or you may make a proffer.

12         MR. RYTTING:  I'll call her by phone.

13         THE COURT:  All right.

14         MR. RYTTING:  I believe she's on the line.

15         THE COURT:  All right.  Ms. Millender, are you --

16  can you hear us?

17         MS. MILLENDER:  Yes.

18         THE COURT:  I'm going to ask my -- Ms. Jantowski

19  to administer an oath.  Once the oath is administered,

20  you'll be testifying under oath and penalty of perjury; do

21  you understand that?

22         MS. MILLENDER:  Yes, ma'am.

23         THE COURT:  All right.  Ms. Jantowski, could you

24  please swear Ms. Millender?

25         THE CLERK:  Yes, Judge.

```
 1            CATRENA MILLENDER, DEFENDANT'S WITNESS, SWORN
 2              THE CLERK:  Ma'am, I -- if you could speak up for
 3   the court reporter so she can get an accurate record,
 4   please?  Thank you.
 5              THE WITNESS:  Yes.
 6              THE CLERK:  Thank you.
 7              THE COURT:  You may proceed, Mr. Rytting.
 8            DIRECT EXAMINATION OF CATRENA MILLENDER
 9   BY MR. RYTTING:
10   Q    Ms. Millender.
11   A    Yes.
12   Q    How long have you known Mr. Rogers?
13   A    Since 2011.
14   Q    And what is your relationship to Mr. Rogers?
15   A    Fiancé.
16   Q    Okay.  And are you familiar or friends with his family?
17   A    Yes.
18   Q    And how long have you been considered a family member?
19   A    Since I been talking to him.
20   Q    Okay.  And, Mr. Rogers -- I mean, Ms. Millender, I'd
21   like you to tell the Court a little bit about yourself.  Are
22   you employed?
23   A    Yes, I am.
24   Q    And what is your position?
25   A    I'm a custodian with the Texas Department of Public
```

1  Safety.

2  Q    And do you -- how long have you had that position?

3  A    For four years.

4  Q    Okay.  But what did you do before that?

5  A    I was staying in Mississippi at the time.

6  Q    So --

7        THE COURT:  Sorry?  What -- excuse me.  Before you

8  were employed with the --

9        THE WITNESS:  Oh, I was custodian with the public

10 -- Pascagoula Food District.

11        THE COURT:  In Louisiana?

12        THE WITNESS:  No, Mississippi.

13 BY MR. RYTTING:

14 Q    Okay.  So you have a steady history of employment,

15 correct?

16 A    Yes.

17 Q    And do you have your own apartment?

18 A    Yes, I do.

19 Q    Okay.  And where is that apartment located?  What is

20 the complex?  Doesn't have to be the address.

21 A    (Indiscernible).

22 Q    Okay.  How long have you lived there?

23 A    I just moved there in -- that apartment, I just moved

24 in there July.

25 Q    Okay.  And are you willing to have Mr. Corteaus Rogers

1   stay with you?

2   A     Yes.

3   Q     Okay.  And has he lived with you past?

4   A     Yes, he has.

5   Q     Have you had any problems with Mr. Corteaus Rogers as

6   far as at all?

7   A     Just at one point we was going through a rocky time.

8   But other than that, no.

9   Q     Okay.  Has he ever threatened you or anything like

10  that?

11  A     No.

12  Q     Okay.  And, Ms. Millender, do you have any firearms in

13  the house?

14  A     No, I don't.

15  Q     Do you allow them?

16  A     No.

17  Q     Okay.  And do you have any -- do you have a criminal

18  record yourself?

19  A     No, I don't.

20  Q     Okay.  So, Ms. Millender, are you willing to serve as a

21  custodian for Mr. Rogers?

22  A     Yes, I will.

23  Q     If he was released and he violated a term of his

24  pretrial release, would you be willing to inform the Court?

25  A     Yes, I will.

1  Q    And do you have the ability to pay the rent and pay for

2  food and extra food and housing for Mr. Rogers?

3  A    Yes, I do.

4  Q    So and would it be a problem for you if Mr. Rogers was

5  wearing an ankle bracelet and was --

6  A    No, I wouldn't.

7  Q    -- confined to your (indiscernible)?

8  A    No, sir.

9  Q    And so have you talked about Mr. Rogers's situation

10 with his mother?

11 A    Actually we just sat down and had conversate (phonetic)

12 about it but we didn't get into details about it.

13 Q    All right.  Is she willing to post some bond, as much

14 as she can --

15 A    Yes.

16 Q    Okay.  Have you discussed about maybe helping

17 financing, too?

18 A    Yes.  I asked and we just sat down but maybe so far I

19 (indiscernible) by financing my home and everything, yes.

20 Q    Okay.  And you have transportation, don't you?

21 A    Yes, I do.

22 Q    Are you willing to bring Mr. Rogers to Pretrial

23 Services to check in for things like that?

24 A    Yes.

25             MR. RYTTING:  Okay.  And with that, Your Honor, I

1  have no further questions for this witness.

2          THE COURT:  All right.  I have a few questions.

3  Ms. Rogers, was --

4          MR. RYTTING:  Millender.

5          THE COURT:  I'm sorry.  Ms. Millender, was

6  Mr. Rogers living with you when -- I understand he's been in

7  custody for about seven months; is that correct?

8          THE WITNESS:  Say that again.

9          THE COURT:  Has Mr. Rogers been in custody -- oh,

10 I'm looking at something different, never mind.  When has

11 Mr. Rogers lived with you?  Give me the dates that he's

12 lived with you, please.

13         THE WITNESS:  It was before I moved out my last

14 apartment and that was in, what, May.

15         THE COURT:  May of 2020 he was living with you.

16         THE WITNESS:  Yes, before May, yes.  It was before

17 May.

18         THE COURT:  And he's got a charge of aggravated

19 assault of a family member in May of 2020; did that involve

20 you?

21         THE WITNESS:  Yes.  We got into an argument.

22     (Pause)

23         THE COURT:  And was he -- he was arrested for that

24 assault?

25         THE WITNESS:  No, no.  They didn't have him

1   (indiscernible) time.

2          THE COURT:  Well he's got an arrest from May 12,

3   2020 for aggravated assault of a family member.  He's got a

4   court case in the 209th District Court.

5          THE WITNESS:  In May?  He wasn't arrested in May,

6   not from me.

7          MR. RYTTING:  Your Honor, may I clarify?

8          THE COURT:  Hold on.  Do you know whether he is on

9   bond for any of these Harris County State proceedings?

10          THE WITNESS:  On bond, on bond, on bond, I don't

11   recall at the time.

12          THE COURT:  All right.  Mr. Rytting, is the

13   Defendant on bond for any of these May, June, or November

14   cases?

15          MR. RYTTING:  I believe that bond was denied with

16   respect to the gun charge that's pending in State Court.  My

17   understanding from looking at the record is that there was a

18   one dollar bond put on the family violence.  My

19   understanding of the record is that family violence is not -

20   - does not involve Ms. Millender at all, that the person

21   that they -- that is supposedly the family member that was

22   assaulted is Ms. Braggs.  And she is not a family member.

23          MS. WIRSING:  Your Honor, may I be heard?

24          THE COURT:  Yes.

25          MS. WIRSING:  The agent has notified me that

1   Ms. Millender filed domestic violence complaint against this

2   Defendant in October of 2019.

3          THE COURT:  All right (indiscernible) in the

4   record.

5          MS. WIRSING:  I'm not sure if it went anywhere,

6   but --

7          THE COURT:  All right (indiscernible) --

8          MS. WIRSING:  (Indiscernible) she testified that

9   they don't have any problems or, you know, he's never caused

10  any harm to her, I think are we taking (indiscernible) some

11  concern.

12         THE COURT:  The May 12th, 2020 charge of

13  aggravated assault on a family member, Mr. Rytting, that

14  involves Ms. Braggs, the person with whom Mr. Rogers was

15  arrested in April?

16         MR. RYTTING:  I believe that is the case, Your

17  Honor, from reading the reports.  I don't believe my memory

18  (indiscernible) that but Ms. Millender is not mentioned in

19  cases as far as I know.  And as you heard from Agent Raj,

20  that name is not familiar with -- to him.  And he was one of

21  the people that was involved in the interview of and the

22  arrest.

23         THE COURT:  All right.

24         MS. WIRSING:  Your Honor, may I be heard?

25         THE COURT:  Yes.

1          MS. WIRSING:  Agent Raj just notified me that
2   Ms. Millender also filed a complaint that this Defendant had
3   stolen her car.
4          THE COURT:  When was that filed?
5          MS. WIRSING:  Standby, please, Your Honor.  Okay,
6   he's working on getting the date right now.
7          THE COURT:  Here's what I want to know,
8   Mr. Rytting.  Was Mr. Rogers arrested for the aggravated
9   assault of a family member on Ms. Bragg (phonetic) around
10  May 12 of 2020?
11         MR. RYTTING:  That is my understanding of the
12  police report.  That's the person that that charge involves;
13  not Ms. Millender.
14         THE COURT:  Okay.  And was Mr. Rogers placed on
15  bond after his May 12, 2020 arrest for aggravated assault of
16  Ms. Bragg?
17         MR. RYTTING:  He was not placed on -- he was not
18  released on the Harris County Jail system.
19         THE COURT:  So he remained in custody at the
20  Harris County Jail after the arrest involving the May 12
21  aggravated assault of Ms. Bragg.
22         MR. RYTTING:  He remained in custody, that is
23  correct.
24         THE COURT:  Then he's got two charges in June,
25  June 9th, 2020; was he on -- how'd he get those charges on

1   June 9th, 2020?

2            MR. RYTTING:  I don't -- I'm not sure how he got

3   those charges, Your Honor.

4            MS. WIRSING:  Your Honor, those are the dates of

5   arrest.  That's not necessarily the dates of the offense.

6   For example, the felon in possession of a weapon is likely

7   the parallel charge in this case, which occurred on April

8   27th.  We have that?  No, we already have that.  And it's

9   difficult to tell with the COVID it was delayed.

10           THE COURT:  Ms. Delgado, are you still with us?

11           (Indiscernible) sense of this.  If he's been in

12   custody apparently since I don't know if it's April 27,

13   May 12, I mean, how -- he's gotten multiple charges picked

14   up after the alleged arrest on the felon in possession of a

15   weapon charge.  That doesn't show up as the charge for

16   April 27.  We've got a credit/debit card abuse felony on

17   April 27.  On May 12, we've got the aggravated assault of a

18   family member.  On June 9th, felon in possession of a

19   weapon.  And June 9th, credit card or debit card abuse.

20           PRETRIAL SERVICES OFFICER DELGADO:  Yes, Your

21   Honor.  If I can clarify the report, my apologies for it

22   being a little vague.  Starting with I believe it's the

23   second page, it's the arrest dated December 17th of 2019,

24   the assault case in Case Number 2281297; do you see it

25   there?

1          THE COURT:  Yes.

2          PRETRIAL SERVICES OFFICER DELGADO:  He's on bond

3    for that case and the victim in that case is Ms. Millender.

4    The next case after that, dated 4/27 of '20, the credit card

5    abuse, he's on bond for that case, Your Honor.  And the next

6    four cases, if I'm not mistaken, he was arrested May 12th

7    for the aggravated assault, the victim in that case

8    Ms. Braggs.  And then the next three after that, I believe

9    those were filed while he's in jail.  So he's been in jail

10   to my knowledge since May 12th on the aggravated assault,

11   and then the other three were filed after that while he's in

12   jail.

13         THE COURT:  All right.  So he was put on bond on

14   December 17 -- or after the December 17th arrest, and that

15   was an assault on Ms. Millender.  And then --

16         PRETRIAL SERVICES OFFICER DELGADO:  And it's a

17   pending case, yes, your Honor.

18         THE COURT:  All right.  Then he was picked up on

19   the 27th and again given bond and --

20         PRETRIAL SERVICES OFFICER DELGADO:  That's

21   (indiscernible).

22         THE COURT:  Yes.  And then while on bond for that

23   is the assault of Ms. Braggs; is that correct?

24         PRETRIAL SERVICES OFFICER DELGADO:  To my

25   knowledge, yes, Your Honor.

1        THE COURT:  All right.

2        MS. WIRSING:  Your Honor, to get back to you on

3   your question, Agent Raj is indicating that Ms. Millender

4   filed a report with HPD on October 29th of 2019, accusing

5   him of taking her car without permission.  It was filed as

6   an investigation into auto theft and no charges were -- have

7   been brought.

8        THE COURT:  All right, thank you.

9        THE DEFENDANT:  The car belonged to me.

10        THE COURT:  You should speak with your attorney,

11   Mr. Rogers.  If you need time to speak with him privately, I

12   will give you that time in just a moment.

13        THE DEFENDANT:  Okay.

14        MS. WIRSING:  Your Honor, if -- I don't know what

15   the Court's inclination is but I would like the opportunity

16   to cross examine.

17        THE COURT:  Yeah.  I just -- I wanted to get these

18   -- this information straight first.  I will give you an

19   opportunity to cross her.

20        MS. WIRSING:  Thank you, Your Honor.

21        THE COURT:  All right.  You may proceed,

22   Ms. Wirsing.

23        MS. WIRSING:  Thank you, Your Honor.

24   Ms. Millender, hi.  My name is Carrie Wirsing.  I'm the

25   Assistant United States Attorney assigned to this case.  I

1  have a couple of questions for you about your relationship

2  with Mr. Rogers.

3              CROSS-EXAMINATION OF CATRENA MILLENDER

4  BY MS. WIRSING:

5  Q    Can you tell us when -- you said you've been together

6  and were together for about four years.

7  A    No, since 2011.

8  Q    Since 2011.

9  A    Yes.

10  Q    And are you aware of Mr. Rogers's criminal history

11  during that time?

12  A    Yes.

13  Q    So you're aware -- and have you ever seen Mr. Rogers

14  use drugs?

15  A    No.

16  Q    You're aware that he was charged with manufacturing and

17  distributing narcotics.

18  A    Yes.

19  Q    And so he didn't use drugs, he just had drugs?

20  A    Actually he never brought him amongst me.

21  Q    I'm sorry?

22  A    Actually, he never brought them amongst me.

23  Q    Okay.  How much time would you say that he actually

24  spent in your house with you when you were together?

25  A    Well, off and on with -- by me (indiscernible) I go

1    pick him up and he'll stay for a little while and then I

2    take him back to Louisiana for about like two weeks.  And

3    then back -- we be back and forth.

4    Q    Okay.  And would you stay in Louisiana or would you

5    just drop him off?

6    A    No, I take him and drop him off with his mom.

7    Q    Okay.  What do you think -- what was he doing in

8    Louisiana?

9    A    That's -- he had to go and report in when he was on

10   probation there so that's what I dropped him off for.

11   Q    And so there were long periods where he was not

12   actually physically staying in the house and therefore you

13   wouldn't be able to be aware of his activities.

14   A    Exactly.

15   Q    Okay.  And you're aware that he has multiple charges

16   and convictions for domestic abuse.

17   A    Yes.

18   Q    And is also violating a court order, a court protective

19   order; are you aware of that?

20   A    Yes.

21   Q    So that was during 2013, that was when you knew him and

22   you were together.

23   A    Uh-huh.  He was in Louisiana at the time when that

24   occurred.

25   Q    Okay, the -- so now --

1  A    (Indiscernible) I had dropped him off and I didn't know

2  (indiscernible) I didn't know until the last minute when it

3  happened so, yeah.

4  Q    And what's your understanding of what had happened?

5  A    That him and someone got into it.

6  Q    I'm sorry, him and who?

7  A    I don't know exactly who the person was but --

8  Q    Okay.  So but it was a domestic assault type of

9  situation, that's your understanding?

10  A    Yes.

11  Q    Okay.  And were you aware that the Court had an order

12  indicating that Mr. Rogers was not to have contact with that

13  victim?

14  A    No.

15  Q    So you're not aware that he violated that order.

16  A    No.  I didn't know that he had a court protection.

17  Q    Are you aware that Mr. Rogers has -- let me back up.

18  And so on October -- you had previously testified that you

19  didn't have any problems with Mr. Rogers, other than just

20  the usual kind of disagreement; is that right?

21  A    Yes.

22  Q    However, it's come to our attention that you did notify

23  the police in October of 2019 that he had assaulted you.

24  A    Yes, we got into it.

25  Q    Okay.  Can you please tell the Court about that

1  incident?

2  A    We just had a disagreement and he just slapped me

3  around.  But other than that we -- actually, we hit each

4  other.  But other than that, no, (indiscernible) --

5  Q    But you were concerned -- I'm sorry.

6  A    I said we was hitting each other.

7  Q    Okay.  But you were concerned enough about your safety

8  to contact the police; is that right?

9  A    Yes, I did contact the police.

10  Q    Do you have any children in your home?

11  A    No, ma'am.

12  Q    Okay.  Are you aware that Mr. Rogers is -- has been

13  court ordered to pay child support to one of his children?

14         MR. RYTTING:  Objection to the relevance.

15         THE COURT:  Yes, Ms. Wirsing, that's not relevant

16  to --

17         MS. WIRSING:  Your Honor, it's the court order

18  that he has violated and that would go to show that he is

19  not either willing or capable of following court-ordered

20  mandates.  And that's exactly, you know, what we're -- the

21  heart of the issue.

22         THE COURT:  All right.  I've got that with the

23  protective order, Ms. Wirsing, the --

24         MS. WIRSING:  Thank you, Your Honor.

25  BY MS. WIRSING:

1   Q    And, Ms. Millender, can you tell us about the report

2   that you filed about Mr. Rogers taking your car without

3   permission?

4   A    That was the same date that we got into in October.

5   Q    Okay.  So he just took off in your car.

6   A    He did jump in and left after we got into it.

7   Q    And -- okay.  So when did you guys break up?

8   A    Actually we stayed apart for a little while after that

9   but we ended up getting back together.

10  Q    When was that?

11  A    We got back together around end of December, January

12  something.

13  Q    December (indiscernible) --

14  A    (Indiscernible) yes, ma'am, between 2019, 2020,

15  December, January.

16  Q    And do you know who Ms. Braggs is, the woman he was in

17  the car with who identified herself as his girlfriend in

18  April of this year?

19  A    Actually I don't know nothing about her.

20  Q    Okay.  Are you aware that there is domestic violence

21  charge against him (indiscernible) --

22             MR. RYTTING:  Objection (indiscernible).

23             MS. WIRSING:  I'm asking if she's aware of his

24  violent nature.

25             THE COURT:  You can ask the witness if she's aware

1  of the charge of domestic violence against Ms. Braggs.  If

2  she doesn't --

3           MS. WIRSING:  And that's what I --

4           THE COURT:  -- know about it, she doesn't know

5  about it.

6           MS. WIRSING:  Okay.

7  BY MS. WIRSING:

8  Q    Do you know about the charge?

9  A    I just found out about it once he got locked up.  Other

10  than that, I didn't know anything else about it.

11  Q    Okay.  So there could be all kinds of activities and

12  charges, criminal charges that Mr. Rogers is involved with,

13  that you have no idea about; --

14           MR. RYTTING:  I'm going to object, --

15  Q    -- is that right?

16           MR. RYTTING:  -- calls for speculation.

17  A    At the time, he wasn't with me so I don't know what was

18  going on, what he was doing in the street.

19           MS. WIRSING:  Okay.  I have nothing further of

20  this witness, Your Honor.

21           THE COURT:  All right.  Anything else,

22  Mr. Rytting?

23           MR. RYTTING:  I do not have any further question.

24           THE COURT:  Ms. Millender, when you got back

25  together with Mr. Rogers, has he lived with you continuously

1  since December of 2019 or is that an off-again, on-again

2  relationship?

3          THE WITNESS:  It was off and on again.

4          THE COURT:  Okay.  All right, thank you, ma'am.

5  You're excused.

6      (Witness excused.)

7          THE WITNESS:  Uh-huh.

8          THE COURT:  All right.  I'm ready for -- do you

9  have any other witnesses or proffers, Mr. Rytting?

10         MR. RYTTING:  I do not, Your Honor.

11         THE COURT:  All right.

12         MR. RYTTING:  Well, proffer -- well, actually not

13 a proffer, no, just if you would, I'd like to make a few

14 comments --

15         THE COURT:  Yes, all right.  We'll proceed with

16 argument.

17         MS. WIRSING:  Shall I proceed, Your Honor?

18         THE COURT:  Yes.

19         MS. WIRSING:  Your Honor, the Government is

20 seeking detention on the basis of risk of flight considering

21 the Defendant's ties to Louisiana, his unstable employment

22 history, his unstable relationship history, his frequent

23 trips back to Louisiana.  We're also very concerned about

24 the safety of this community.  That includes the women with

25 whom Mr. Rogers associates.  The -- his criminal record is

1   of concern, particularly the prior felon in possession of a

2   firearm convictions, he has a couple, so Mr. Rogers should

3   have been aware that he was not to lawfully possess the

4   firearm to which he admitted possessing in this case.  Your

5   Honor, also while Mr. Rogers has not been charged with the

6   purse snatchings, it is -- we would ask the Court to take

7   into consideration the fact that several purses and wallets

8   were found in his vehicle.

9          Even if it was -- if we take his word that he was

10  selling knockoff purses, that's an illegal activity in and

11  of itself.  We also have a concern about his drug use, which

12  is a factor, or his involvement with drugs, which is a

13  factor for the Court's consideration in detention.

14         The proffered -- or the proposed residence for

15  Mr. Rogers, Ms. Millender, it does not seem to be a stable

16  environment for Mr. Rogers to stay in.  His time spent with

17  her was very inconsistent, and she was not aware of the full

18  breadth of his activities.  And, moreover, he had previously

19  assaulted her, according to her testimony, and took off in

20  her car.  And as the agent testified, Mr. Rogers was

21  reportedly stopped in a stolen vehicle on the date of his

22  arrest here as well.

23         Pretrial Services is recommending detention and

24  without bond and we concur with that recommendation, Your

25  Honor.

1            THE COURT:  Thank you, Ms. Wirsing.  Mr. Rytting.

2            MR. RYTTING:  Yes, Your Honor.  The involvement --

3    risk of involvement with drugs dates back several years.

4    There hasn't been as far as I can tell from the testimony

5    any involvement since for nearly three or four years.  The

6    incidents of domestic violence, although concerning, was

7    described as a minor -- relatively minor combat between two

8    adults that was -- involved Ms. Millender as much as

9    Mr. Rogers.  And he left rather than continuing the -- any

10   escalating the battle.

11           He left in her car and he I think it's pretty

12   clear from the testimony that she realized that car was not

13   stolen and that he had the right -- actually that she had

14   given him the right before to use it I'm sure.  So the idea

15   that he was committing crimes against Ms. Millender I think

16   is -- has not been established to the -- should not be

17   considered established to the satisfaction of the Court.

18   The -- she has -- she's willing to provide a place for him,

19   and he will be under whatever constraints the Court wishes

20   to add to those:  electronic monitoring, appearing before

21   the Pretrial Services.  And it'll be a different situation,

22   different context than in the past.

23           Those combinations of constraint and the fact that

24   he has no other -- there's talk about ties to Louisiana.

25   The ties were as far as we can tell from the testimony of

1    the State and from Ms. Millender were to go back to fulfill

2    conditions of probation, to meet with probation officers.

3    So he was fulfilling these important functions within the

4    criminal justice system and appearing for his -- appearing

5    in court, and that's why he was going back to Louisiana.

6    There's every reason to believe that he will appear in court

7    and that Ms. Millender will bring him to Pretrial Services.

8    That's what that record establishes.

9         So right now we have a situation in which there is

10   a pandemic in jail.  He would be safer outside.  He will be

11   on an electronic monitor.  And the -- and she is still

12   obviously willing to report violations of the terms of his

13   probation and any harm against her.  That harm did not

14   involve weapons, it didn't involve serious bodily injury

15   against Ms. Millender.  And it is unfortunately a very

16   common experience under the conditions that we face right

17   now in many households.

18        So I think that the State hasn't established that

19   he will run.  There is no place for him to run.  It makes no

20   sense.  And nor have they established that he is going to

21   commit acts of violence to the -- certainly not against

22   anyone outside the family and outside the household, and

23   even then he has a long history, there's a single incident

24   and that should not result in confinement, certainly under

25   these present conditions in Joe Corley.

1          THE COURT:  All right.  I find that there are many

2    concerning factors that are at issue here today.  And,

3    counsel, frankly I cannot agree with you that there has been

4    no evidence of violent behavior either toward Ms. Millender,

5    she testified to it.  And I'm very concerned about the

6    assault on the person with whom he was arrested on

7    October 27.  There's a charge roughly two weeks later of

8    assaulting that person.  So those are very concerning

9    issues.

10          I -- we have prior violation of a court order and

11   the violation of a protective order.  We have the facts

12   that's most concerning is that I don't think I can set any

13   conditions that would be followed by Mr. Rogers.  He has

14   been on bond for his April 27 arrest and then that's the

15   period he's on bond and he commits the aggravated assault

16   against Ms. Braggs, the person with whom he was arrested or

17   who was with him on the day he was arrested.

18          He also was given bond in that case, and then a

19   little unclear to me whether there is a new -- whether the

20   June 9th, 2020 charges are just charges that were filed in

21   connection with the April 27th arrest.  But I certainly have

22   instances of Mr. Rogers failing to follow requirements of

23   conditions of release or conditions of bond.  And then we've

24   got the November, 2020 charge of felon in possession of a

25   weapon.  We've got one in June, one in November.

1        He was on bond at both of those times, was on bond

2   on the date that he committed the assault of the person with

3   whom he was in the car in which the purses and wallets were

4   found and in which he had the weapon.  That witness via

5   testimony from Agent Raj that the witness that he assaulted

6   is the witness who informed police that he instructed her to

7   put the weapon by her when they were being pulled over

8   during that traffic stop on April 27th.

9        I don't believe that there are any conditions of

10  release that I can set that would reasonably assure both the

11  safety of the community and Mr. Rogers's appearances in this

12  case.  He does have very few contacts here.  He has an

13  unstable living situation, in my opinion.

14       While Ms. Millender says that she's willing to be

15  a third party custodian, I'm sure that she believes that,

16  the fact that he has assaulted her, that she has pressed --

17  has contacted police about the assault, that she contacted

18  police about his alleged theft of her car, those are factors

19  that tell me that she is not able to provide the kind of

20  influence that a third party custodian needs to provide over

21  an individual.  And I -- frankly, I am very concerned about

22  having him confined to an apartment with someone that he has

23  previously assaulted.

24       So based on all these factors and others which I

25  will write out in a written detention order, I am finding

1  that the Government has met its obligation to demonstrate by

2  clear and convincing evidence that there is -- there aren't

3  any conditions that can protect the community, and that it

4  has demonstrated by a preponderance of the evidence that

5  Mr. Rogers is a risk of flight.  Therefore, I'm going to

6  order that he be detained and has been recommended in the

7  Pretrial Services Report.  Anything else --

8           Anything else we need to cover today with

9  Mr. Rogers?

10          MS. WIRSING:  Nothing from the Government, Your

11  Honor.

12          MR. RYTTING:  Nothing from the --

13          THE COURT:  All right.

14          MR. RYTTING:  Nothing from the defense, Your

15  Honor.

16          THE COURT:  All right.  Thank you, everyone,

17  you're excused.  I'll issue my order later today.

18          MR. RYTTING:  Thank you.

19      (Proceeding adjourned at 11:38 a.m.)

20

21

22

23

24

25                      *  *  *  *  *

1              *I certify that the foregoing is a correct*

2   *transcript to the best of my ability due to the condition of*

3   *the electronic sound recording of the ZOOM/telephonic*

4   *proceedings in the above-entitled matter.*

5   */S/ MARY D. HENRY*

6   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9   *JTT TRANSCRIPT #63339*

10  *DATE FILED:  FEBRUARY 24, 2021*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25